310

Jay-Bee Realty Corporation, Appellee, v. Agricultural
Insurance Company et al., Appellants.

Gen. No. 42,529.

Opinion filed September 27, 1943. Rehearing denied October 11, 1943.

LORD, BISSELL & KADYK, of Chicago, for certain appellants.

LAURENCE W. SMITH, of Grand Rapids, Mich., and McKINNEY, FOLONIE & GREAR, of Chicago, for certain other appellants; LAURENCE W. SMITH, of Grand Rapids, and HENDRIK FOLONIE, of Chicago, of counsel.

JOHN L. McINERNEY and WILLIAM JAFFE, both of Chicago, for appellee; WILLIAM JAFFE and IRVING EISENSTEIN, both of Chicago, of counsel.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

Defendants, 22 insurance companies, and Underwriters at Lloyd's, England, hereinafter called Lloyd's, appeal from a decree fixing and directing payment of their several liabilities totaling, with interest, $226,254.32, under 45 Michigan standard fire insurance policies covering a frame hotel building known as Golfmore Hotel, and the personal property therein; canceling a first mortgage on the hotel premises and contents and the note for $100,000 secured thereby, acquired by defendants after liability under the policies had accrued because of a fire in the hotel on November 20, 1939, and enjoining the sale, transfer or assignment of the mortgage and note or institution of any action at law or suit in chancery upon them.

The Golfmore Hotel property comprised a tract of approximately 137 acres, with a lake frontage of about 1,000 feet adjacent to the village of Grand Beach, Michigan. The building proper was of a frame construction with stucco walls, three stories with a high attic and a basement and contained approximately 150 guest rooms, with dining room, dancing facilities, bar, and other accommodations of a modern summer resort hotel. There was an auxiliary building known as the Pinewood Inn, which is not involved in this litigation. The hotel was open from Declaration Day until after Labor Day. It was built in 1923, was operated by the

owners for several years, became involved in litigation and was in the hands of a receiver, Grand Rapids Trust Co., of Grand Rapids, Michigan, appointed by the Federal Court. In 1935 the property was sold to the receiver as the only bidder for approximately $145,000, being the amount of receiver's expenses, etc. It was then closed. In February 1937 the Trust company contracted to sell it to Solomon E. Harrison for $175,000 and accrued taxes approximating $30,000. The purchase price was to be paid $50,000 in cash by September 1, 1937, and the balance to be secured by a first mortgage of $100,000 and a second mortgage of $25,000. The latter mortgage represented undisclosed commissions to be paid to Albert Mehlman, a partner of Harrison and owner of 50 per cent of the stock of Golfmore Properties, Inc., to which the contract of purchase was assigned. Mehlman's interest having been disclosed, the second mortgage was surrendered and discharged in 1938 upon payment to the Trust company and others of various sums aggregating $18,900 in adjustment of the controversy and the elimination of Mehlman from the enterprise. In 1937 the hotel was furnished and certain improvements, including the building and equipping of the Casino and a dining room, and restuccoing of the exterior of the building were made at a cost of more than $50,000. Harrison and Mehlman were unable or unwilling to meet their September 1937 obligations and open the hotel the following year. Albert E. Berger then became the financial backer. The Golfmore Properties, Inc., assigned the contract of purchase to him and he organized plaintiff and assigned the contract to it; payments were made and warranty deed to the property was delivered to plaintiff in the Fall of 1937 and the first and second mortgages executed and delivered. At the time of the fire Berger was secretary, treasurer, director, principal stockholder, principal creditor to the extent of $110,000 and managing head of plain-

tiff and all its affairs. In 1939 the hotel was a fully equipped, modern summer resort hotel.

The fire practically destroyed the building. Only a few chimneys, the brick work inclosing the elevator, and a small portion of one of the walls remained standing. All the contents were destroyed. Immediate notice of the fire was given and proof of loss was filed within the 60 days specified in the policies. Although the question of incendiarism in the origin of the fire was raised in the pleadings, no evidence to support the charge was introduced on the trial.

Defendants interpose three defenses in bar of the action. (1) That the action is not cognizable in equity. Defendants contend that since our Civil Practice Act now permits a single action at law against all the defendants to recover the amount due from each, equity should not assume jurisdiction to avoid multiplicity of suits, and that our Supreme Court in *Weininger v. Metropolitan Fire Ins. Co.*, 359 Ill. 584, erred in assuming that the computations required in prorating the liability of the respective defendants is an accounting which gives courts of equity jurisdiction. The *Weininger* case was instituted under the old Practice Act against sixteen defendants to recover upon nineteen fire insurance policies aggregating $25,000. As in the case at bar the policies there contained a provision for prorating the aggregate loss on the property in the proportion that the insurance written under each policy bore to the total insurance carried. The amount of the loss was contested in each case. In sustaining the equitable jurisdiction the Supreme Court (pp. 589, 590) said: "The liabilities of the defendants here by reason of the controverted issues as to the amount of loss and the *pro rata* features of the policies are interrelated and interdependent. There is involved herein, therefore, not only the question of multiplicity of suits, but, if there is a recovery by the complainants, the further fact that when the loss is determined

some sort of accounting is necessarily required to fix and prorate the amounts for which the defendants are severally liable. We conclude that the case here presented is a proper one for the assumption of jurisdiction by a court of equity, not only upon the ground of avoiding a multiplicity of suits but also because an accounting is likewise involved. *Milwaukee Mechanics' Ins. Co. v. Ciaccio,* 38 Fed. (2d) 153; *American Central Ins. Co. v. Harmon Knitting Mills,* 39 id. 21.'' Jurisdiction to avoid multiplicity of suits has long been exercised by courts of equity. This jurisdiction is not taken from equity by statutes permitting the joinder of many causes of action that formerly were not permitted to be joined in one action at law. 1 Story's Eq. Jur. (14th Ed.), sec. 104, citing *Labadie v. Hewitt,* 85 Ill. 341. In that case the court after the Legislature had provided for partition by petition, said: ''It has been repeatedly held, that when the General Assembly gives a new remedy, by petition, under the statute, it in nowise affects the jurisdiction of the court of chancery; that the new remedy is cumulative; that the court of chancery may proceed under its original jurisdiction as though the cumulative remedy had not been given, unless limited or restricted by statute. The court of chancery has entertained and exercised jurisdiction in cases of partition from quite an ancient period. Courts of law were also invested with jurisdiction to adjudge and make partition, even before it became a source of equitable relief. After chancery assumed jurisdiction, the courts of law continued to make partition, without any change in their mode of procedure. But the practice in the British courts of law was inconvenient and cumbersome, and our General Assembly, to remedy the evil, gave a petition in lieu of the old writ of partition, and prescribed the practice thereunder. But it has never been supposed that, in doing so, they designed to take away the jurisdiction from the courts of chancery, or intended

thereby, in any degree, to alter or amend the practice in that court.'' In the later case of *Chapman v. American Surety Co.*, 261 Ill. 594, where it was contended that the settlement of guardianship accounts having been placed by statute in the probate court, it was intended to take jurisdiction from a court of chancery, the court (p. 604) said: ''Wherever that court (Equity) has, as a part of its inherent powers, jurisdiction in certain matters, such jurisdiction is not, in general lost or abridged where other courts have acquired jurisdiction to grant the same or different relief. (1 Pomeroy's Eq. Jur. — 3d ed. — sec. 276.) The same author says in section 279: 'Where the new power is conferred upon the law courts by statutory legislation, the rule is well settled that unless the statute contains negative words or other language taking away the pre-existing equitable jurisdiction, or unless the whole scope of the statute, by its reasonable construction and its operation, shows a clear legislative intent to abolish that jurisdiction, the former jurisdiction of equity to grant its relief under the circumstances continues unabridged.' Statutes that abrogate or abridge that jurisdiction are to be strictly construed.'' The civil practice act makes available to courts of law certain practices theretofore limited to courts of chancery. It does not and was not intended to narrow or reduce the jurisdiction of equity. Rule 10 of the Supreme Court (Ill. Rev. Stat. 1941, ch. 110, par. 259.10 [Jones Ill. Stats. Ann. 105.10]), provides: ''All matters which, prior to January 1, 1934 were within the jurisdiction of a court of equity . . . shall be heard and decided in the manner heretofore practiced in courts of equity.''

Jurisdiction of equity in cases of this nature is based upon more than the avoidance of a multiplicity of suits. In *American Cent. Ins. Co. v. Harmon Knitting Mills*, 39 F. (2d) 21, the court said: ''If equity has jurisdiction of this cause, it is because it will avoid numerous

actions at law. But something more is required than the avoidance of a multiplicity of suits. There must be a common interest existing among the individual defendants and between them and the plaintiff in order that a court of equity may interfere. Section 267, Pomeroy, Equity Jurisprudence (4th Ed.). This common interest exists in the present suit, if at all, because of the similar provisions in all of the insurance policies and particularly because of that provision heretofore quoted which makes each appellant liable for only its proportion of the total loss. Is this common interest of such a nature, extent, and object, as to justify the assumption of jurisdiction by a court of equity? We think it is." This case was cited in *Weininger v. Metropolitan Fire Ins. Co., supra,* where, as quoted above, the court held that by reason of the controverted issues as to the amount of loss and the pro rata features of the policies, the liabilities of the defendants were interrelated and interdependent and that not only the question of multiplicity of suits was involved, but also the necessity of some sort of an accounting when the loss is determined to fix the pro rata amounts for which the defendants are severally liable. Necessity for an accounting in the present case is greater than in either of the cases cited. The number of defendants and policies involved, as well as the number and variety of items of personal property destroyed, is greater; the testimony is reported in more than 6,000 pages, and the numerous exhibits cover about 1,000 additional pages. Fixing the total loss within any reasonable degree of accuracy, or correctly apportioning the loss among the various defendants would be beyond the average jury. "The jurisdiction in equity attaches, unless the legal remedy, both in respect to the final relief and the mode of obtaining it, is as efficient as the remedy which equity would confer under the same circumstances." 1 Story's Eq. Jur. (14th Ed.) note on page 38.

(2) That the original complaint failed to state a cause of action, and the necessary amendment having been made after the 12 months limitation period of the policies had expired, the action was barred. To support this contention defendants cite cases decided before the Civil Practice Act in force when this action was brought. These cases need not be considered. In construing the Practice Act governing this action the Supreme Court in *Graves v. Needham,* 379 Ill. 25, 27, said: "Where a pleading is filed in apt time, section 46 (Ill. Rev. Stat. 1941, chap. 110, par. 170, p. 2423) permits any amendment, after the time for commencing suit, to set up a cause of action on any claim which was intended to be brought by the original pleading, provided only, that it grew out of the 'same transaction or occurrence,' namely, the same action. It is not necessary that the original pleading technically state a cause of action, or that a cause of action set out in the amendment be substantially the same as any cause of action stated in the original pleading. In *Metropolitan Trust Co. v. Bowman Dairy Co.,* 369 Ill. 222, we said: 'These changes, together with the judicial construction of the prior statutes, evince the legislative intent to remedy the evils incident to the former legislation and to preserve causes of action against loss by reason of technical rules of pleading.' " The original complaint was filed in apt time. It set forth the numbers of the policies sued upon, the defendants issuing the respective policies, the property covered, the date of the fire, etc., and charged "that by the terms of all of said policies of insurance . . . the defendants and each of them promised and agreed to insure the plaintiff." The change which defendants insist was necessary in order that the complaint state a cause of action, and which plaintiff made by amendment, was the insertion of the phrase, "the said plaintiff being named as the insured in each of the various policies of fire insurance." If we concede that this

amendment was necessary to the statement of a cause of action, the amendment related back to the filing of the original complaint, and the position of the defendants cannot be sustained.

(3) That false swearing, concealment and misrepresentation by Berger rendered the policies void and bar the action. Each policy contained the following provision. ''This entire policy shall be void if the insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof; or, in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after loss.'' This provision, common to insurance policies, has been uniformly upheld by the courts and the general rules relating to fraud applied to it. To avoid a policy the fraud must be as to a material matter and must be wilful and with intent to deceive and defraud the insurer. It must be proved by clear and convincing testimony. *Weininger v. Metropolitan Fire Ins. Co.,* 359 Ill. 584, 598. Whether there is fraud is a question of fact to be determined by the jury or the master. *Commercial Ins. Co. v. Friedlander,* 156 Ill. 595. Where the master's finding of facts has been approved by the chancellor the reviewing courts are not justified in disturbing the findings unless they are manifestly against the weight of the evidence. *Mruk v. Mruk,* 379 Ill. 394, 401; *Litwin v. Litwin,* 375 Ill. 90, 96; *A. J. Canfield Co. v. McGee,* 306 Ill. App. 226, 230; *Zamis v. Hanson,* 302 Ill. App. 404, 408. No claim was made for property not destroyed. One item of personal property, relatively unimportant in comparison with the total loss, was duplicated in the proof of claim and eliminated when the duplication was discovered. Berger was twice examined under oath and at all times evinced a willingness to cooperate with defendants in their search for information—books, records, invoices, files, etc., were produced on request.

Defendants charge fraud as to four separate matters. (a) As to the cost of the property purchased from the Trust company and as to the second mortgage thereon. There is no question that Harrison in good faith entered into an agreement to give the Trust company $50,000 in cash, a $100,000 first mortgage and a $25,000 second mortgage for the property. The cash was paid and the mortgages given. After Harrison had discovered that the Trust company and Mehlman had secretly entered into a contract whereby Mehlman, a partner of Harrison's, was to receive the proceeds of the second mortgage for his services in inducing Harrison to buy the property, efforts were made to procure a surrender and cancellation of the mortgage. Apparently the bank felt that it could not surrender the mortgage without the consent of all claiming an interest in its proceeds. In settling the controversy various sums, aggregating $18,900, were paid to the Trust company and others, including an informer. This amount covered payments for alleged interests in the second mortgage. Defendants insist that the proof in respect to the transaction is not satisfactory, but it is not contradicted and it is not inherently unreasonable. In an examination before the trial Berger testified that Mehlman had no interest in the company or part or share in its profits. On the trial Berger repeated this statement, and on further questioning said that he, Berger, had promised to pay Mehlman $4,200 out of any dividends which might be received on Berger's stock, at the rate of 25 per cent of such dividends when, as and if paid, and produced a copy of his letter to that effect. Upon these facts, Mehlman did not have any interest in the plaintiff company or in its profits, as such, which he could assert against plaintiff. His claim against Berger, personally, for a part of what Berger might receive by way of dividends, is not material in determining the

amount of loss and damage in this case and defend-
ants' liability therefor.

(b) That Berger testified falsely in respect to ex-
hibit "AA". In its proof of loss plaintiff claimed
$345,280.81 as the sound value of and loss and damage
for the building. This amount, as shown by the evi-
dence, was made up by averaging three general con-
struction bids made by reputable and responsible con-
tractors, in competition with each other and in ex-
pectation of getting the job of rebuilding the hotel,
and adding thereto the cost of certain equipment and
building expense such as surety bond, insurance dur-
ing construction and architect's fees at figures given
by plaintiff's architect, making a total cost to rebuild
of $383,645.34, and deducting therefrom 10 per cent for
depreciation. At the close of one of his examinations
before the trial Berger produced the paper in evidence
as exhibit "AA" as one of the methods that he used to
check back as to whether or not his opinion was correct
as to the sound value of the building stated in the
proof of loss. The exhibit is confusing, and Berger's
explanation of it was involved and required the intro-
duction of two other exhibits which included estimated
figures not shown on the books. It took from, rather
than added to, the proof of loss. It was an unsound
argument in support of what was a reasonable opinion
of replacement cost stated in the proof of loss and
based upon competitive bids made in the regular
course of business. The sound value of the building
on the date of the fire shown in the exhibit was several
thousand dollars higher than the amount claimed in
the proof of loss, but no claim based on the higher
figure was ever made.

(c) That Berger fraudulently concealed a chattel
mortgage to himself covering all the personal prop-
erty. This claim is based upon a resolution of a joint
meeting of the stockholders and directors of plaintiff

on December 28, 1937. At that time Berger had advanced approximately $45,000, and additional working capital was needed to open the hotel the following summer. A resolution was passed authorizing but not directing the president and secretary (Berger's employee and Berger) to execute a mortgage or trust deed upon all the property, real and personal, of plaintiff, to secure Berger's advances and future advances of any stockholder up to $75,000. In subsequent corporation reports signed by Berger and filed with the Secretary of State of Michigan, the indebtedness to Berger is shown as secured by an unrecorded chattel mortgage. No witness testifies that the mortgage was ever executed and delivered. The officers of the corporation testify that none was executed. The auditors who prepared the corporation reports say they never saw a chattel mortgage but relied first upon the resolution and then on the former report. The master was justified in finding that no chattel mortgage was ever executed. Without doubt Berger, with his dominant position in the corporation, could have had the mortgage by asking for it. The resolution left its execution to the discretion of the officers. Defendants claim that the resolution created an equitable mortgage to Berger, and although Berger is not shown to have asserted any right under the resolution, the defendants insist that without Berger's consent, or even against his will, the defendants can assert his alleged equitable rights against plaintiff in order to escape their legal obligations to pay for the loss and damage caused by the fire. Neither reason nor authority support this contention.

(d) Fraud as to the personal property—its value, its actual cost, and the fact that some of it had been bought second hand. After the closing of the hotel in September 1939, an inventory was taken of the personal property in the building. After the fire, Albert Rothschild, a man with wide experience in the

furnishing and equipment of hotels, as an employee of Albert Pick & Co., and in the contract department of Mandel Bros., where he handled the equipment of hotels and clubs and made appraisals, fixed the replacement cost of approximately 80 per cent of the items in the inventory. In his business he had visited the hotel from the time Harrison took it over in 1937, selling equipment and going through it with employees before each yearly opening to ascertain if any new equipment or furnishings were needed. Berger supplied the replacement cost of the remainder of the personal property. This inventory, consisting of 48 pages, with the cost plainly indicated as the replacement cost, was submitted to defendants. Thereafter a summary of the inventory and the replacement costs shown thereon was included as part of the proof of loss. Property on which Albert Pick & Co. held a mortgage was deducted, a sales and use tax and drayage and installation costs were added, making a total of $131,777.09, from which was deducted an over-all depreciation of 10 per cent, making a claim for the sound value and loss and damage of the personal property, $118,559.39. At the request of defendants, Berger marked upon the inventory the actual cost price of the property to plaintiff or its predecessors, Golfmore Properties, Inc., or the Trust company, the year purchased and from whom bought. He also gave information as to the property bought second hand and at auction sales.

Defendants complain of the concealment of a discount on a bill from Samuel Winternitz & Co., auctioneers. The Winternitz purchase was made in 1937 when Harrison was in control and before Berger became the managing director. The purchase consisted of bedroom furniture from the Robb Furniture Company, then out of business, and was billed to Harrison. Berger testified that he got the bills and all information from Mrs. Harrison and did not know about the commission before July 1941. Plaintiff was under no

obligation to distinguish between new and used furniture and equipment in the inventory or proof of loss. Neither was it obliged to give the actual cost of the personal property in these papers. When the information was asked for it was freely given and it was substantially accurate and complete. Questions of value are largely a matter of opinion. Opinions diverge as interests conflict. The values presented by plaintiff are high and those presented by defendants are low. In the proof of loss the claim of sound value and loss and damage of personal property is $118,559.39. This is substantially the replacement costs shown on the inventory after allowing for additions of taxes, drayage and installation costs, and deductions of 10 per cent. Rothschild testified that the actual value of the personal property on which he fixed replacement costs in the inventory was $88,000, after allowing depreciation of 20 per cent. Berger fixed the actual value of the remaining personal property at $20,000. This makes a total of $108,000. The difference between the value fixed by the testimony and in the proof of loss is practically the difference between Berger's depreciation over-all of 10 per cent and Rothschild's depreciation of 20 per cent. The master found the value to be $97,000, which is about 20 per cent less than the proof of loss and about 10 per cent less than the value fixed by plaintiff's witnesses on the trial.

Defendants' witnesses placed the values much lower. As to most of the personal property, except bedroom furniture, defendants relied upon the testimony of Fanselow, a store equipment designer and builder of restaurant, hotel and food serving equipment. He based all his replacement values upon second hand or used material. There is a direct conflict in the testimony as to whether or not a second hand market for this material existed in Chicago and whether the great bulk of it could be purchased second hand. Plaintiff

based its replacement values on reproduction new, and deducted depreciation. The 30 foot soda fountain and back bar will illustrate the different methods. Plaintiff's witness testified that this fountain was hand carved. Defendants' witness said that it was not. Plaintiff bought the fountain at an auction sale for $170.50 and claimed a reproduction value when installed of approximately $3,600. Fanselow placed the replacement value at $900 to $1000, but testified on cross-examination that in 1939 a new outfit could be gotten for about $3,000. The master's finding as to value of the personal property is well within the range of the testimony. The values claimed by plaintiff are not so grossly exaggerated as to constitute fraud. *Commercial Ins. Co v. Friedlander*, 156 Ill. 595; *Commercial Cabinet Co. v. North British & Mercantile Ins. Co.*, 220 Ill. App. 453; *Campbell v. Great Lakes Ins. Co. of Chicago*, 228 Mich. 636. Further detailing of the evidence on this point is unnecessary. A careful examination of the record and a close analysis of Berger's testimony, in the light of defendants' charges against him, fails to show that the finding of the master on the question of the alleged fraud of plaintiff is manifestly against the weight of the evidence.

Defendants urge in bar of any action on the insurance covering the personal property, that this property was covered by chattel mortgage to the Grand Rapids Trust Company, and one to Berger, without permission of defendants, and thereby the insurance on the personal property was suspended. The alleged Berger chattel mortgage has been considered and conclusions reached adverse to defendants. The chattel mortgage held by the Trust company is the $100,000 first mortgage heretofore mentioned, which covered both real and personal property. The policies contain the following provision. "Unless otherwise provided by agreement in writing added hereto, this company shall not be liable for loss or damage to any property

insured hereunder while encumbered by chattel mortgage." As a part of each policy there is a Loss Payable Clause providing that the loss, if any, on personal property is "to be adjusted only with the insured (plaintiff) and payable to the insured and Grand Rapids Trust Company as their respective interests may appear." Attached to and made a part of each policy is a rider which defendants designate as "Mortgage Clause to Grand Rapids Trust Company." This rider is further entitled, "Standard Mortgage Clause," and is in part as follows: "Loss or damage, if any, under this policy shall be payable to Grand Rapids Trust Company, mortgagee, (or trustee) as interest may appear." These provisions bring the case within the decision in *Ohio Hardware Mut. Ins. Co. v. Northeast Georgia Land Co., Inc.,* 79 F. (2d) 753, and must be construed as consent by defendants to the mortgage.

Defendants complain that the master and the chancellor adopted a wrong rule as to actual cash value. Each policy insured plaintiff "to the extent of the actual cash value (ascertained with proper deductions for depreciation) of the property at the time of loss or damage, but not exceeding the amount which it would cost to repair or replace the same with material of like kind and quality within a reasonable time after such loss or damage." The meaning of actual cash value, with proper deductions for depreciation, is to be determined by the law of Michigan. An experienced lawyer and an experienced appraiser from that State, called by defendants, testified in substance that the Michigan courts have not fixed a fast and hard rule as to what is actual cash value; that a plaintiff is entitled to recover such an amount as would restore him to the same property status he occupied before the property was burned—no more and no less, and that the actual cash value is the sound value of the property, determined by considering market value, economic value, reproduction cost, condition of the

building, depreciation, including obsolescence, and any other features which might affect the value. Plaintiff produced several witnesses who testified to the reproduction value of the building, less depreciation, and one witness who fixed the actual cash value based upon the reproduction cost, economic and market values, cost to plaintiff, etc. His value, less depreciation, was $295,000. Defendants produced three expert witnesses who testified to the actual cash value, less depreciation. Their figures were comparatively close. Each professed to consider all the elements of value mentioned. Palmer, the Michigan expert, testified that his final cash valuation of $210,000 can also be expressed in the terms of the original reproduction cost, minus depreciation, but he "would not want the impression to be conveyed that we say that is how we did it." Perce, a Chicago appraiser, fixed an actual cash value less depreciation of $218,170.29, which he stated was exactly the same as its reproduction value depreciated under his method. Gueroult, also a Chicago appraiser, fixed a reproduction value less depreciation of $218,315.89, and an actual cash value, with proper allowance for depreciation, of about $210,000, after taking into consideration the reproduction value less depreciation, the purchase price and the economic value of the property as a going hotel, or the earning power value. He then testified that reproduction value less depreciation is an important factor in determining value and that any other value ceases to be a reasonable measure when it is too far removed from reproduction less depreciation; that if he were asked to make a computation or appraisal for the purpose of indemnifying a person for a fire loss and put him back in the same property status, he would use the reconstruction less depreciation method, and the answer would be sound value.

Thus it will be seen that each of the witnesses for defendants had in mind the reproduction cost less

depreciation as the prime and controlling factor in determining actual cash value. Plaintiff's replacement cost, as stated in the proof of loss and testified to by the witnesses, is based upon contractors' bids in the regular course of business and in competition with each other, when it was expected that the hotel would be rebuilt, plus certain permanent fittings and appliances and construction expense, such as architect's fees, insurance and bond. According to defendants' witness who had spent four or five days in examination of the building in October 1937 in making an appraisal for the Grand Rapids Trust Company, the plans from which the contractors' bids were made were in a general way an honest reproduction of the building in accordance with the notes he had taken. The reconstruction cost used by defendants' witnesses was based upon conclusions of expert witnesses, arrived at for the purpose of testifying, and were considerably lower than plaintiff's cost. As is usually the case where opinions become evidence and experts are called, each expert testifies in support of the theory of the party calling him, and there is a wide divergence in the testimony. Generally, somewhere in between is the truth. In this case the testimony as to a proper architect's fee ranged from 2½ to 5 per cent; the depreciation to be deducted, from 16 to 41¼ per cent; the replacement value before depreciation, from $383,645.24 to $249,270; and replacement cost after depreciation, from $345,280.81 to $210,000. There is nothing in the record to show what particular rule or method the master employed in arriving at his figures, $290,000 for the building and $97,000 for the personal property. Each finding is within the range of the testimony and as it is not manifestly against the weight of the evidence it should not be disturbed by a reviewing court.

The master received in evidence the inventory and proof of loss for the limited purpose of proving that

same had been filed with defendants as required by the policies. After Rothschild had testified to the replacement costs fixed by him, and Berger had testified to the cost price of certain articles placed on the inventory at the request of defendants and had testified to the value of the items listed on exhibit 49A, being the items for which Rothschild had not furnished replacement costs, these exhibits were received in evidence without limitation of purpose or effect. These papers were certainly available to the witnesses to refresh their recollections, and each witness might have been examined separately as to each item appearing on the exhibits and thereby several hundreds of pages of testimony added to the record. In the final result the master in preparing his report would have labored through this additional testimony to get the information concisely stated in the exhibits. If the exhibits were not properly received in evidence for all purposes, no harm has resulted to defendants.

Defendants complain that the court erred in construing the policies against the defendants, but do not point out in what particulars the court erred in so doing or the harm, if any, to the defendants.

By the decree interest is allowed plaintiff from February 12, 1940. Proof of loss was sent to defendants January 10, 1940. By the terms of the policies the loss or damage for which the company may be liable is payable 30 days after proof of loss. The Interest Act (Ill. Rev. Stat. 1941, ch. 74, par. 2 [Jones Ill. Stats. Ann. 67.02]) provides: "Creditors shall be allowed to receive (interest) at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing . . . ." This part of the statute, except for change in the rate of interest, has been in force since 1845. As early as 1857 our Supreme Court held that interest is recoverable on fire insurance policies. In the case of *Peoria Marine & Fire Ins. Co. v. Lewis,* 18 Ill.

553, in an action on a policy under which the insurer was obligated to pay the actual cash value of the property, the court said (562, 563) : "By the very terms of the policy the insured is required to furnish proofs of the *amount* of the loss. The assured must liquidate the amount of the loss by his evidence sixty days before it becomes due by the policy. But by the contract it does become due within sixty days after this proof is made. It is true the amount may be controverted by proof, yet that will not change the principle, because the true amount may be variable. Whatever is due becomes due and payable within the time fixed, after the tender of proofs and will bear interest from that date." To the same effect are *Knickerbocker Ins. Co. v. Gould,* 80 Ill. 388, 395; *Home Insurance & Banking Co. v. Myer,* 93 Ill. 271, 277; *Firemen's Fund Ins. Co. v. Western Refrig. Co.,* 162 Ill. 322, 323.

The decree finds the defendant Lloyd's liable under the Threefourths Value Clause of the policies for $405.75, and for $2,633.25 under the Unearned Premium Clause of the policies. No finding is made as to the amounts due from the other defendants. No objection is made to the finding of Lloyd's liability or to the amounts found to be due. Defendants' objection is based upon the claim that the Detroit Insurance Agency, agent for all the defendants other than Lloyd's, paid plaintiff a sum in excess of the unearned premiums due from its principals and reimbursed itself by deducting the amount paid from sums owing to it by the defendants other than Lloyd's, and that if Lloyd's were now directed to pay plaintiff the amounts due from it, plaintiff would be obliged to pay out a portion of the money to reimburse Lloyd's codefendants for overpayments of unearned premiums, and that the decree is erroneous in failing to provide for this adjustment. The liabilities of the defendants under the clauses now being considered are several, not joint. If plaintiff is indebted to the re-

maining defendants because of overpayment under these clauses, the indebtedness is a direct and unconditional liability, independent of the amounts, if any, recovered from Lloyd's. The Detroit agency is not a party to the suit, and the defendants other than Lloyd's have not by any pleadings claimed this amount.

Furthermore, it does not appear from the record that the defendants other than Lloyd's have overpaid the plaintiff, if the two clauses are considered. Plaintiff introduced a computation showing the liability for unearned premiums of all defendants excepting Lloyd's to be $4,035.99. The amount due from all defendants under the Threefourths Value Clause is $1,311, according to the figures stated by plaintiff in its brief, and not challenged by defendants. Of this amount the decree charges $405.75 to Lloyd's, leaving a balance of $905.23 due from the remaining defendants. Thus the amounts due the defendants other than Lloyd's under the two clauses is $4,941.22, an amount in excess of the $4,916.96 paid by the Detroit agency to plaintiff. The claim is therefore without basis in fact.

On the hearing on exceptions to the master's report the defendants objected to the master's fees and asked that the master appear for examination as to his services and fees. The court denied the request and fixed the master's fees at the amount claimed by him. Defendants objected that there appeared to be an overcharge of 2,000 folios, or $300, in taking evidence. Objection was also made to the charge for 320 hours in actual hearing of the case, and in addition thereto 680 hours in reading and analyzing the pleadings, reading the transcript of testimony and exhibits, preparing the report and examining authorities cited by the parties. If the 320 hours claimed for actual hearing of the case includes time spent in taking testimony, it is an overcharge to that extent. The charge

for services should be itemized and the master should have been required to appear for examination as to his fees. *Fitchburg Steam Engine Co. v. Potter*, 211 Ill. 138, 152–157; *Litwin v. Litwin*, 375 Ill. 90, 97; *Gottschalk v. Noyes*, 225 Ill. 94, 100–102.

The decree of the superior court is affirmed in all respects except as to the master's fees. The cause is remanded with directions to hear evidence and determine the services rendered by the master and fix the fees therefor. The costs in this court will be taxed one-fourth against the plaintiff and three-fourths against the defendants, each defendant being taxed with the same proportion of the costs taxed against the defendants that the insurance carried by each defendant bears to the insurance carried by all.

*Affirmed except as to master's fees and remanded with directions, to retax these fees.*

O'CONNOR, P. J., and MATCHETT, J., concur.