**Rocco DiLeo, et al., Plaintiffs-Appellants, v. United States Fidelity and Guaranty Company, a Corporation, et al., Defendants-Appellees.**

**Gen. No. 51,877.**

First District.

March 21, 1969.

Rehearing denied May 20, 1969.

George C. Rabens, of Chicago, for appellants.

Clausen, Hirsh, Miller & Gorman, of Chicago, for appellees.

MORAN, J.

Plaintiffs, Rocco and Angelo DiLeo, appeal from a judgment awarding them damages in the gross amount of $4,987.87 pursuant to an action in law brought by them to recover for business interruption loss under policies of insurance issued by the defendants, Fireman's Fund Insurance Company, National-Ben Franklin Insurance Company of Pittsburgh, and National Fire Insurance Company of Hartford.

Plaintiffs seek remandment to the trial court with direction to enter judgment in their favor to the increased gross amount of $13,370.08 with prejudgment interest thereon to the date of entry of judgment, at the rate of 5% per annum from and after October 15, 1958, in equal amounts as to each of these defendants.

Defendants on cross-appeal contend plaintiffs' recovery, measured by the "time to restore" clause in the applicable insurance endorsements, was limited by the "actual loss sustained" clause also contained in the endorsements which, when applied, produces an amount of recovery substantially less than that awarded by the trial court.

On January 9, 1957, the named defendants issued their respective policies of fire insurance insuring the plain-

30

tiffs during the period from January 9, 1957, to January 9, 1960, against direct loss by fire due to business interruption, as defined in the policies, suffered by plaintiffs in their grocery and meat market in a brick mercantile building situated at 1122 West Erie Street, Chicago, Illinois. Each of the three policies insured against business interruption loss up to an amount of $10,000. Each policy also included an endorsement entitled, "Business Interruption Form No. 3," which, in pertinent part, provides:

"1. Subject to all its provisions and stipulations, this policy covers only against loss directly resulting from necessary interruption of business caused by damage to or destruction of real or personal property by the peril(s) insured against during the term of this policy, except as hereinafter specifically excluded or limited, on premises occupied by the insured as . . . and situated . . . Illinois.

"2. The measure of recovery in the event of loss hereunder shall be the reduction in gross earnings directly resulting from such interruption of business, less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, but not exceeding the ACTUAL LOSS SUSTAINED by the Insured resulting from such interruption of business. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.

"3. Gross Earnings: For the purposes of this insurance 'Gross Earnings' are defined as the sum of:

"(a) Total net sales, and

"(b) Other earnings derived from operation of the the business, less the cost of:

"(c) Merchandise sold, including packaging materials therefor,

"(d) Materials and supplies consumed directly in service(s) sold, and

"(e) Service(s) purchased from outsiders (not employees of the Insured) for resale which do not continue under contract.

"No other costs shall be deducted in determining 'Gross Earnings.'

"In determining 'Gross Earnings' due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

". . .

"7. Resumption of Operations: If the Insured, by resumption of complete or partial operation of the property herein described or by making use of other property, equipment or supplies, could reduce the loss resulting from interruption of business, such reduction shall be taken into account in arriving at the amount of loss hereunder."

Prior to 1:00 a. m., on June 27, 1958, plaintiffs' business was being operated in the building on West Erie Street under a lease which was to expire on December 31, 1959. At that time a fire occurred which caused substantial damage and destruction to plaintiffs' property in the store and to the building.

During the period of 1958, prior to the fire, the building in which plaintiffs' store was situated had been condemned by the City of Chicago under an area clearance project for the construction of the Northwest Express-

way. In the condemnation proceedings, plaintiffs were awarded a judgment of $1,200 for their leasehold interest. Thereafter, on May 27, 1958, plaintiffs were served with notice by the City of Chicago, requiring them to surrender the premises on June 30, 1958.

Following the fire, plaintiffs unsuccessfully negotiated a settlement with their insurers on the "contents" loss and "business interruption" loss policies. After summary judgment holding the various insurers liable to plaintiffs, both as to "contents" and "business interruption" loss, was entered on July 16, 1962, and affirmed by the Appellate Court, DiLeo v. United States Fidelity & Guaranty Co., 50 Ill App2d 183, 200 NE2d 405, the defendants in this cause amended their answer to plaintiffs' complaint, admitting loss to plaintiffs from business interruption in the amount of $2,131.37, but denying any liability in excess of that amount. Trial before a judge without a jury proceeded on the issue of recoverable damages from the three insurer-defendants liable under the policies of business interruption insurance, resulting in a judgment for plaintiffs in the amount of $4,987.87.

In their cross-appeal, defendants contend that the court erred in failing to apply the "actual loss sustained clause" contained in Business Interruption Form No. 3 to limit the measure of recoverable damages. Defendants urge that under this measure plaintiffs suffered no actual business interruption loss beyond June 30, 1958, when their tenancy automatically terminated due to the prior condemnation proceedings, payment of award to plaintiffs, and notice of termination. By reason of such termination together with evidence that plaintiffs were not granted an extension of the right to remain in possession, it is argued that plaintiffs had a business interruption insurable interest for only the four days ending June 30, 1958.

The trial court made specific findings of fact and conclusions of law relative to the issues raised by defendant.

Among other things, the court found that notice of tenancy termination was served upon plaintiffs personally by Richard Cervelli, an employee of the Relocation Board of the City of Chicago. At the time of such service there was no evidence of any statement made to plaintiffs by Mr. Cervelli. Further, while there was testimony for the plaintiffs that they were assured that they would not be required to vacate the premises until a later date, the court was of the opinion that the witness was mistaken. The plaintiffs made no specific request for an extension of time regarding the June 30, 1958, termination of their tenancy, and no formal extension of time to vacate the premises was granted.

There was testimony for the defendants given by Anne Klope, Assistant Supervisor of the Relocation Board, that at the time of the service of notice on May 27, 1958, the policy of the Board with respect to extension of time in cases where a notice terminating tenancy had been served was that if there were no contract to wreck in force, the tenant would have been given an extension from a few days up to thirty days, but that if there were a contract to wreck, even though such contract was to wreck an entire area comprising numerous buildings, no extension of time to vacate would be given. It was further the policy that if the tenant failed to vacate on time, an eviction suit would be filed within a few days after the tenancy termination date. The Relocation Board did not take into consideration whether a particular building was scheduled for wrecking in the immediate or near future.

Prior to the fire, and on May 19, 1958, pursuant to a contract with the State of Illinois, Department of Public Works, the Midwest Wrecking Company commenced demolition work in connection with the land clearance for the construction of the Northwest Expressway. The contract covered about forty-five to fifty buildings, including the building in which plaintiffs' store was located

and work continued under the contract until May 19, 1959. Demolition of individual buildings included in the contract was indicated to the wrecking company by a district engineer of the State of Illinois. This engineer scheduled the demolition of the building in which plaintiffs' store was located for August 1, 1958, and nothing more was said by him, other than that the building was ready for wrecking. Although razing of the building began on August 1, 1958, it was not established that the building would have been demolished on that date had it still been occupied and in use, rather than having suffered the loss and damage due to the fire on June 27.

The court further found that at a previous location on Huron Street, the plaintiffs had also occupied space subject to condemnation and had received notices to quit but had thereafter obtained extension permitting them to remain for approximately an additional six months, after which they moved to Erie Street in 1955. On various occasions in other instances the Relocation Board entrusted with the duty of occupant removal from condemned property had granted extensions of time for removal. Also, at the time of the fire, the plaintiffs had made no changes in their operation or with respect to location of their equipment and did not anticipate removal until later in 1958 when space in another building owned by their father would become available to them.

Upon these findings, the court postulated several conclusions of law, significant to this cross-appeal. The court held that the "actual loss sustained" clause at the end of the first full sentence of paragraph 2 in "Business Interruption Form No. 3," (supra) is a limitation upon the measure of recovery provided in the first part of the same sentence, referred to as the "time to restore" clause.

The court further held that on June 27, 1958, when the fire occurred, plaintiffs continued to have an insurable interest in a going grocery business which was in-

terrupted on that date because of the fire. Plaintiffs' insurable interest in their business was not affected at the time of the fire by the previous award of $1,200 for their leasehold or the previous receipt of notice to vacate on June 30, 1958. Before the fire, plaintiffs reasonably expected to continue their profitable business and did not intend to abandon it, which action was compelled solely because of the fire. The recovery of plaintiffs under the policies, particularly "Business Interruption Form No. 3," is not limited to either the date indicated for their removal by the notice terminating their occupancy on June 30, 1958, or by August 1, the date upon which the demolition of the structure actually commenced. Such recovery is also unaffected by the failure of plaintiffs to resume the grocery business after four months of business interruption either at the location described in the policies or elsewhere.

Finally, with respect to the issues of this cross-appeal, the court held that the burden of establishing that the plaintiffs could not have remained in the premises subsequent to August 1, 1958, in the absence of damage and loss by fire, was upon the defendants and they have not sustained that burden.

It is defendants' theory that although the court concluded as a matter of law that the "actual loss sustained" clause contained in Business Interruption Form No. 3 is a limitation on the measure of damages formulated in the "time to restore" clause of this same endorsement, it erred by failing to apply such limitation to the facts of the present case. Mr. Edward R. Brunke, a defense witness with experience in adjusting numerous business interruption losses, testified that the "time to restore" clause applies in determining the suspension or business interruption period in the usual case, though he had encountered losses in which the limiting language of the "actual loss sustained" clause controlled. Defendants cite Finer Amusements, Inc. v. Citizens Ins. Co. of New Jer-

sey, 327 F2d 773, as direct authority for application of the "actual loss sustained" provision rather than the "time to restore" clause under policy endorsements similar to the case at bar. There the insured had policies protecting against the loss of rents for the building occupied by plaintiff in case of a fire which left the premises untenantable. The policy provided that the insurer would pay plaintiff an amount equivalent to the rents or rental value less charges and expenses as do not necessarily continue after the destruction or damage of the insured property, for only such length of time it would require, with the exercise of due diligence, to put the premises in tenantable condition, but not exceeding the actual loss sustained by the insured. While the Court of Appeals held that plaintiff had sustained no actual loss for which the insurer was liable, this determination was made by direct application of the policy formula for computing damages, namely, rental value less expenses which did not necessarily continue during the time required to repair the premises. In effect, the court's determination of damages, as in the present case, was based upon the explicit policy language found in the "time to restore" clause.

Although the Finer Amusements case, supra, fails to support defendants' argument, the issue itself remains to be decided whether under the facts of the present case plaintiffs' recoverable business interruption loss was limited to the four days ending June 30, 1958, when their tenancy was terminated. Addressing their argument to the extent of plaintiffs' insurable interest, defendants cite two cases where the insured was denied recovery on fire insurance policies covering loss of property when title to the insured property had passed to the condemners prior to its destruction. Peninsular Fire Ins. Co. v. Fowler (Fla), 166 So2d 206 (1964); Lanza v. National Fire Ins. Co. of Hartford, 246 F Supp 453. The rationale underlying each of these decisions is that

lacking title to the insured property, the insureds did not have an insurable interest at the time of the loss. However, these cases involve policies covering building losses where the necessary insurable interest relates to proof of incidents of ownership or control of the property sufficient to demonstrate possible economic disadvantage to the insured upon some adverse occurrence to the insured property. See Peninsular Fire Ins. Co. v. Fowler, supra.

Similarly, several cases cited by plaintiffs to demonstrate that insureds have been allowed recovery under policies of fire insurance even after condemnation proceedings were initiated, are not in point. See Edlin v. Security Ins. Co., 269 F2d 159; Dursie v. American Union Ins. Co. of New York, 207 Pa Super 240, 218 A2d 87. These and other such authorities quoted by plaintiffs do not concern policies of business interruption insurance.

It is necessary to determine the insurable interest sufficient to support business interruption insurance in order to decide whether plaintiffs' recovery was limited to the last four days of June, 1958. In his book, "Business Interruption Insurance," (5th ed, Nov, 1964), under the heading, "Insurable Interest," Henry C. Klein says at page 15:

> "Earnings Must Be In Prospect—Occupancy, use of, or dependency upon the object of coverage alone does not create Business Interruption Insurable Interest in it. There must also be the prospect of business earnings, consisting of net profits or fixed charges and operating expenses that would have been earned but for property damage to and destruction of the object."

Defendants contend that all prospect of business earnings with respect to plaintiffs' grocery and meat market business on West Erie Street terminated on June 30,

38

when plaintiffs were legally obliged to vacate the premises. We disagree.

Plaintiffs could have remained on the premises at the sufferance of the City of Chicago and until such time as a petition for ejectment was filed and fully processed. Although no formal extension of occupancy was granted and apparently none would have been granted because of the policy of the Relocation Board not to do so once a contract to wreck was in force, nevertheless, the assistant director of the Relocation Board testified that in the past condemnees had remained on the premises for a period of months following the termination of their tenancy. In fact, plaintiffs had remained six months beyond the date of termination of their tenancy at the former business location in Huron Street during 1955.

The plaintiffs testified that they had every intention to remain at their location in West Erie Street and continue their business until some later date in 1958 at which time space would become available to them in a building owned by their father. No changes were made in the operation of the business and not one item of equipment had been moved out of the premises in anticipation of releasing the premises, at the time the fire occurred.

Under these circumstances we believe that there existed a definite prospect of business earnings and continuance of a going business at 1122 West Erie Street when the fire curtailed operations. Although the prospective period of business earnings was indefinite, defendants have not demonstrated that plaintiffs could not have remained on the premises at the sufferance of the City of Chicago well beyond June 30, 1958, or that the building would necessarily have been demolished on August 1, 1958, were it not for the fire.

■■■ The trial court, therefore, did not err in applying the measure of damages formulated in the "time to restore" clause of "Business Interruption Form No. 3"

without reference to the "actual loss sustained" provision.

We next consider whether the trial court was correct in deducting from the gross earnings the salaries of all plaintiffs' employees except for a two-week period which plaintiffs paid.

The plaintiffs contended in the trial court that they were entitled to collect for the whole four-month period, less an abatement of 25%. One of their witnesses, Mr. Louis Fienk, a public fire insurance adjuster testified that he had prepared a statement or proof of loss for the DiLeo brothers which was based on information that he got from their accountant and that only 25% of the salaries would be abated. He said he discussed with the DiLeos the possibility of eliminating the employees entirely for the four-month period and he was advised that these employees were mainly butchers who had been with the DiLeos for many years and had a substantial following of customers, and therefore they could not be dispensed with entirely.

Defendants contended in the trial court that the salaries of all of plaintiffs' employees which were paid for only two weeks after the fire should properly be abated for all of the suspension or interruption period beyond the said two weeks. They argued that the sentence in Clause 3 which allowed for normal charges and expenses, meant that the expenses should not only have been necessary, but that they had to continue and that since the salaries were paid for only two weeks, such salaries abated as a noncontinuing expense for all of the suspension period beyond the two weeks.

The trial court adopted the contention of the defendants, stating that "under Form No. 3 all expenses which do not necessarily continue during the applicable suspension period must be abated. If any expense items are not paid, they must be abated because otherwise, if the salaries were allowed without evidence of payment, the

insureds would receive more under the policy than they would have received if they had continued in business. The policies do not contemplate giving the insureds such extra profit."

The plaintiffs now argue that construing business interruption Form No. 3 to permit abatement of salaries of key personnel merely upon the basis of nonpayment after a period of time is not consistent with the provisions of the policy because whether or not the employees were actually paid is not determinative, i. e., the policy form in question contemplates restoration of the business and it is for that, that the premium for the policy was paid. The form states that "due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the insured with the same quality of service which existed immediately preceding the loss." They point out that there is nothing in the provision that requires that the salaries actually be paid—only that they be normal charges and expenses that are necessary to adequate resumption of the assureds' operations.

The defendants now argue that all of the salaries of plaintiffs' employees beyond the two-week period were properly deducted from the reduction in gross earnings as charges and expenses which did not necessarily continue during said suspension or interruption period. They state that plaintiffs' assertion that "nothing in said provision requires salaries to be paid," is absurd on its face and that the quoted sentence plainly requires that all such normal charges and expenses shall not only be necessary, but they shall continue. They also point out that plaintiffs completely ignore throughout their argument the first sentence in paragraph 2 which prescribes that the measure of recovery shall be the reduction in gross earnings "less charges and expenses which do not necessarily continue during the interruption of busi-

41

ness." They explain that under this provision, even if an expense continued and was paid during the interruption period, if it were not necessary to do so, it would still be deductible.

█ We interpret business interruption Form No. 3 to mean that there shall be deducted from gross earnings charges and expenses which do not necessarily continue during the interruption of the business. However, we do not interpret this form to mean that all payroll expenses that are not actually paid do not necessarily continue within the meaning of the policy. The last sentence of paragraph 2 of Form No. 3 contemplates that there will be some normal charges including payroll expenses in restoring any business interrupted by fire. "Normal" is defined in Form 3 as "the condition that would have existed had no loss occurred as a result of damage or destruction by the peril(s) insured against." The fact that the insured decides not to resume business does not change the nature of the expense even though it will probably make his proof more difficult.

█ Under policies which insure against loss from interruption of business, the fact that the period required to rebuild or replace with due diligence and dispatch is entirely theoretical does not impede recovery. Anchor Toy Corp. v. American Eagle Fire Ins. Co., 4 Misc2d 364, 155 NYS2d 600. In fact, the trial court so found in this case. In other words, If an insured suffers a business interruption because of fire and actually goes back into business, the reduction in gross earnings under Form 3 would be based on the actual amount of time necessarily spent to restore the business. However, if he decides not to go back into business, that fact does not impede recovery but he must prove the length of time it would have taken him to restore the business. He is entitled to recover in either event. The only difference is that in the first case his proof is governed by the time actually

and necessarily taken to restore the business, while in the second case his proof is governed by estimates.

▇ The fact that the payroll expenses are entirely theoretical should not impede recovery of them. If the assureds actually went back into business there should be deducted from gross earnings all payroll expenses less those the trial court finds plaintiffs necessarily expended to retain those key personnel necessary to resume business with the same quality of service which existed immediately preceding the loss. However, if plaintiffs do not go back into business, the abatement would be all of the payroll expense less the amount the trial court finds the plaintiffs would have had to expend for those key personnel it found insured would have necessarily had to retain in order for the insureds to resume business with the same quality of service which immediately preceded the loss.

Then too, by the very terms of the policy, the insured is required to furnish proofs of the amount of loss. He must liquidate the amount of the loss by his evidence sixty days before it becomes due by the policy. How he could make this proof and meet defendants' requirement that payroll expense necessary to resume operations of insured for the period of business interruption be actually paid is difficult to see.

Defendant also argues that "the actual loss sustained" phrase in Form No. 3 prohibits plaintiffs from recovering for any salaries that have not actually been paid. The "actual loss sustained" phrase in Form No. 3 is obviously meant to apply only when there is an actual resumption of the insured's business. The measure of loss is based on either of two criteria: (a) loss of gross earnings for a limited period of time *as estimated* when there is no resumption of business, or (b) actual loss, inferring an *actual* resumption of business. Since there was no resumption of business in this case, (a) and not (b) applies.

43

The trial court in this case found that the time it would have taken for plaintiffs to go back into business was four months. What the normal payroll expenses for key personnel plaintiffs would have had to incur during that time to resume business "with the same quality of service which existed immediately preceding the loss" is a proper question for the trial court to consider on retrial of this case.

Finally, plaintiffs contend that pursuant to the Illinois Interest Act, (c 74, § 2, Ill Rev Stats 1957), prejudgment interest on the award should be allowed.

■ Both parties agree that fire insurance policies are "written instruments" within the meaning of section 2 of the aforesaid Act. The question is from what date is interest allowable on moneys which a court determines are due under the policies. The applicable provision concerning when loss is payable under the policies in the instant case provides:

> "The amount of loss for which the Company may be liable shall be payable sixty days after proof of loss, as herein provided, is received by this company and ascertainment of the loss is made either by agreement between the insured and this Company expressed in writing or by the filing with this Company of an award as herein provided."

In the case of Peoria Marine & Fire Ins. Co. v. Lewis, 18 Ill 553, the court said at 562–63:

> "By the very terms of the policy the insured is required to furnish proofs of the *amount* of loss. The insured must liquidate the amount of the loss by his evidence sixty days before it becomes due by the policy. But by the contract it does become due within sixty days after this proof is made. It is true the amount may be controverted by proof, yet that will not change the principle, because the true amount may be variable. Whatever is due becomes

44

due and payable within the time fixed, after the tender of proofs and will bear interest from that date."

Upon authority of this case and of Stock v. Reliance Ins. Co., 96 Ill App2d 8, 238 NE2d 420, DiLeo v. United States Fidelity & Guaranty Co., 50 Ill App2d 183, 200 NE2d 405, and Jay-Bee Realty Corp. v. Agricultural Ins. Co., 320 Ill App 310, 50 NE2d 973, we hold that interest should be awarded upon the sums due commencing sixty days after proofs of loss were submitted to the respective defendants.

For the foregoing reasons this case is affirmed in part and reversed in part and remanded to the trial court for proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part, and remanded.

EBERSPACHER, J., concurs.

GOLDENHERSH, P. J., dissenting:

I respectfully dissent from the conclusion reached by the majority.

In its findings of fact the trial court found that the time required, with the exercise of due diligence and dispatch, to restore the building to a condition suitable for use in the operation of plaintiffs' business was 4 months (finding No. 30). This finding of fact is supported by the evidence.

There is no need to remand the cause to determine what the normal payroll expenses for key personnel necessary to enable plaintiffs to resume business would be during the four-month period, for the reason that the trial court has already done so. In its finding No. 24 the trial court adopted the calculations in defendants' exhibit 2 which are predicated upon a normal payroll for the period of $12,040.42, and an actual payroll of $1,381.69, and the evidence sustains a finding that these

expenditures were necessary within the contemplation of the policy. Had plaintiffs actually paid these sums for the four month period, they would be recoverable under the policy.

The fact that plaintiffs did, or did not resume business does not affect the measure of recovery under the policy. In either event the time in question is that required "with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed." Even in instances where there is an actual resumption of business, there might still be an issue of whether it was accomplished with due diligence and dispatch, and in both situations the measure of recovery is the reduction in gross earnings, less charges and expenses which do not necessarily continue.

The evidence shows that although the retention of the employees was necessary to enable plaintiffs to resume operations with the same quality of service which existed immediately preceding the loss, the fact is that plaintiffs' actual loss is only for the two-week period. In my opinion the judgment compensates plaintiffs for the actual loss sustained, and to award plaintiffs a sum of money admittedly not expended would result in a recovery in excess of what is warranted by the provisions of the policy.

In my opinion, the trial court awarded plaintiffs the sum due under the evidence, and in that respect I would affirm the judgment.

I agree with what was said by the majority with respect to prejudgment interest, and would remand the case for the sole purpose of modifying the judgment by awarding plaintiffs interest on the sum of $4,987.87, commencing 60 days after the date on which defendants were furnished proof of loss.