IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| XL INSURANCE AMERICA, INC., TALBOT UNDERWRITING SERVICES (US) LTD., FACTORY MUTUAL INSURANCE COMPANY, AXIS INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY SURPLUS INSURANCE CORPORATION, ACE AMERICAN INSURANCE CO., ASPEN INSURANCE UK LTD., STEADFAST INSURANCE COMPANY, AIG EUROPE LIMITED, SCOR UK COMPANY LIMITED, SWISS RE INTERNATIONAL S.E., AND CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, | § § § § § § § § § § § § § § § § § | No. 444, 2019<br><br>Court Below: Superior Court of the State of Delaware<br><br>C.A. No. N17C-01-152 (CCLD) |
| Defendant Below, Appellant, | § § § § | |
| v. | § § | |
| NORANDA ALUMINUM HOLDING CORPORATION, | § § § | |
| Plaintiff Below, Appellee. | § § § | |

Submitted: July 22, 2020
Decided: October 2, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED**.

Ilana H. Eisenstein, Esq., Rachel A.H. Horton, Esq., DLA PIPER LLP (US), Philadelphia, Pennsylvania; Aidan M. McCormack, Esq., DLA PIPER LLP (US), New York, New York; John L. Reed, Esq., Matthew Denn, Esq., (*argued*), Kelly L. Freund, Esq., DLA PIPER LLP (US), Wilmington, Delaware, *for Appellants/Cross-Appellees XL Insurance American, Inc., et al*.

David B. Goodwin, Esq., Christine S. Haskett, Esq., (*argued*), COVINGTON & BURLING LLP, San Francisco, California; David J. Baldwin, Esq., BERGER HARRIS LLP, Wilmington, Delaware, *for Appellee/Cross-Appellant Noranda Aluminum Holding Corporation.*

**TRAYNOR**, Justice:

Following two operation-disabling accidents, an insured aluminum-products manufacturer, whose "all-risks" property-insurance policy included business-interruption coverage, did not rebuild its damaged facility and consequently did not resume operations. The insured and its insurers agreed that the failure to rebuild and resume operations does not negate the business-interruption coverage. But when the insured submitted its business-interruption claim, the parties could not agree on how to calculate the insured's gross-earnings loss, which is the measure of the insurers' liability under the relevant policy. A lawsuit in the Superior Court ensued. After a seven-day trial, the jury found in favor of the insured, and the insurers appealed.

At trial, the insured's damages expert employed a model that measured the insured's gross-earnings loss by comparing the value of the insured's production had the accident not occurred with the value of its production after the accidents had it repaired and resumed operations with due diligence. Although the parties dispute whether the insurers took issue with this methodology—as opposed to its factual underpinnings—in the proceedings below, in this appeal, the insurers contend that the model is inconsistent with the policy's formula for calculating gross-earnings loss and that it grossly exaggerated the amount of the insured's claim. The insurers also challenge the insured's expert's factual assumptions and claim that he improperly included amounts that the insured had waived in an earlier property-

3

damage settlement. For its part, the insured has cross-appealed, asking us to reverse the trial court's post-verdict reduction of the jury's verdict to eliminate recovery of an increased electrical expense that, according to the court, was not covered by the policy.

For the reasons that follow, we conclude that the insured's expert's damages model was consistent with the relevant policy provisions and that the trial court's determination that the factual assumptions made by the expert were sufficiently reliable for the jury to consider was not an abuse of discretion. Likewise, we hold that the insurers' claim that the earlier property-damage settlement precluded a portion of the insured's recovery is without merit. Finally, we agree with the Superior Court's conclusion that the insured's increased electrical expense was not, as presented, properly added to the insured's gross-earnings loss.

Therefore, we affirm.

## I. BACKGROUND

### A. Factual Background

Noranda, an aluminum-products manufacturer, operated an integrated aluminum smelting and casting plant in New Madrid, Missouri (the "Smelter"). At the Smelter, Noranda mined and refined raw materials, produced aluminum from the raw materials, and carried out other downstream activities to manufacture and sell finished aluminum products. The Smelter had three potlines, each with over 150

4

steel containers, known as pots. An electrical current ran through the potlines to convert raw material into molten aluminum. The Smelter also had a casthouse where equipment shaped the molten aluminum into finished aluminum products.

From 2013 to 2015, Noranda recorded multi-million dollar losses due largely to a decline in aluminum prices. Industry analysts anticipated, however, that aluminum prices would rebound starting in the first quarter of 2016. In August 2015, an explosion at Noranda's casthouse damaged both the building and equipment (the "Casthouse Explosion"). The damage from the explosion limited production of one of Noranda's more profitable products. In the wake of this misfortune, Noranda's board of directors retained financial advisors to explore the company's restructuring options. In December 2015, the board decided that Noranda should pursue Chapter 11 bankruptcy protection while keeping the Smelter running to reduce costs and defer expenditures so that the company could remain in business until 2016, when aluminum prices were projected to rebound.

On January 7, 2016, a second accident occurred at the Smelter. A breakdown of electrical equipment—specifically, a switchgear—disrupted the operation of the potlines, causing molten aluminum to solidify in hundreds of pots in two of the Smelter's three potlines (the "Potline Freeze"). The two potlines were inoperable until the frozen aluminum could be extracted and the pots restarted.

5

In February 2016, Noranda filed a Chapter 11 bankruptcy petition. Even with the assistance of the bankruptcy process, however, it was no longer economically feasible to continue operating the Smelter. In March 2016, Noranda shut down the Smelter. In November 2016, Noranda sold the Smelter as part of its bankruptcy proceeding.

**B. Insurance Claims**

At the time of the Casthouse Explosion and the Potline Freeze, the Smelter was covered by several "all risks" property-insurance policies, all of which have the same material terms, conditions, and exclusions. Noranda and its insurers (the "Insurers") agreed that the policy issued by Factory Mutual Insurance Company, which provided 50% of Noranda's coverage (the "Policy"), would be the relevant policy for Noranda's claims in this litigation. Noranda submitted claims for the Casthouse Explosion and the Potline Freeze for three categories of loss: property damage, business-interruption losses, and professional fees associated with claims preparation.

The Policy's property-damage component covered the cost to repair the Smelter. Noranda and the Insurers settled the property-damage claims for both accidents for approximately $38.5 million, of which about $16 million was related to the Potline Freeze. As a condition of the settlement of the Potline Freeze claim, Noranda released the Insurers from liability from any claims relating to the Potline

6

Freeze except "any portion of the [Potline Freeze Claim] relating to any replacement costs or non-property damages."[1]

The Policy's business-interruption component covers lost earnings resulting from the accidents for a defined time period during which the business interruption persists. The Insurers paid Noranda approximately $5.6 million for claimed business-interruption losses associated with the Casthouse Explosion, but denied the remainder of Noranda's business-interruption claim, including all of the business-interruption losses associated with the Potline Freeze. The Insurers also denied Noranda's claim for professional fees related to the Potline Freeze.

### 1. The GROSS EARNINGS formula[2]

Noranda elected to pursue its business-interruption loss from the Casthouse Explosion and the Potline Freeze under the GROSS EARNINGS formula of the Policy,[3] which provides that Noranda's loss is to be measured as follows:

1) The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

    a) Gross Earnings;

---

[1] Answering Br. at 14 (quoting App. to Opening Br. at A2406).
[2] Unless otherwise defined in this opinion, capitalized terms have the meaning or should be interpreted as set forth in the Policy.
[3] The Policy provided Noranda with the option to pursue a business-interruption claim based on GROSS EARNINGS AND EXTENDED PERIOD OF LIABILITY formula or a GROSS PROFIT formula.

b) less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

c) less ordinary payroll; and

d) plus all other earnings derived from the operation of the business.

e) Ordinary Payroll . . . to the extent such payroll continues following the loss and would have been earned had no such interruption happened.[4]

The Policy defines the "PERIOD OF LIABILITY" of a business-interruption claim as the period beginning at the time of the accident and "ending when with due diligence and dispatch the building and equipment could be: i) repaired or replaced, and ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage."[5] The Policy defines "Gross Earnings" as "the net sales less cost of all raw stock, materials and supplies used in such production."[6]

## C. The Experts' Calculations

Each party retained an expert forensic accountant to calculate Noranda's business-interruption loss. Noranda retained Christopher Hess, and the Insurers

---

[4] App. to Opening Br. at A205–06. For the sake of clarity in distinguishing the components of the GROSS EARNINGS formula, we refer to the resulting calculation as the "Measurement of Loss."
[5] *Id.* at A211–12. The parties disputed the PERIOD OF LIABILITY below. The issue was submitted to and considered by the jury. The PERIOD OF LIABILITY is not challenged on appeal.
[6] *Id.* at A206.

retained Peter Karutz. The parties agreed that subpart (a) of the GROSS EARNINGS formula (the "Gross Earnings Component")[7] was designed to measure the insured's loss of Gross Earnings during the PERIOD OF LIABILITY. In calculating the Gross Earning Component, the parties further agreed that a comparison should be made between Noranda's Gross Earnings if the accidents had not occurred (the "But For World") with Noranda's Gross Earnings if the accidents occurred and Noranda made repairs (the "Hypothetical Repair World").[8] Both parties reasoned that this was the appropriate comparison for determining the Gross Earnings Component because the Policy requires Noranda to mitigate its losses. The parties further agreed that, had Noranda repaired the Smelter, Noranda's Gross Earnings would gradually ramp up—increasing production thereby reducing its earnings loss—as the two frozen pots were brought back into operation. Thus, Noranda's Gross Earnings loss would gradually decrease over the PERIOD OF LIABILITY.

---

[7] The parties interchangeably refer to the Gross Earnings Component as "lost production," "lost margin," and "net revenues."

[8] App. to Opening Br. at A1675 (Hess, testifying for Noranda, stated that "the two scenarios are both hypothetical: One, as if the accident never happened, a projection . . . of what they would have done absent the loss. The other . . . you're trying to project [Noranda's lost production] had they come back and rebuilt . . . ."); A1971 (Karutz, testifying for the Insurers, conceded "that the correct comparison for assessing Noranda's lost margin is between what would have happened if there had been no accidents and what would have happened if there were accidents but Noranda had gone ahead and made repairs.").

The parties differed, however, as to whether the comparison between the But For World and the Hypothetical Repair World applied to all components of the GROSS EARNINGS formula.[9] According to Hess, Noranda's expert, this comparison applied across all parts of the GROSS EARNINGS formula. According to Karutz, the Insurers' expert, the But For World and Hypothetical Repair World comparison only applied to the Gross Earnings Component, not to subpart (b) (the "Charges and Expenses Component") or subpart (c) (the "Payroll Component").

Similar to his calculation of the Gross Earnings Component, when calculating the Charges and Expenses Component and the Payroll Component, Hess compared Noranda's But For World expenses and Noranda's Hypothetical Repair World expenses. At this step, Hess made two critical assumptions. First, based on information provided by the Smelter's former manager, Chad Pinson, Hess understood that in the But For World Noranda anticipated laying off numerous employees, but that Noranda may not have executed the layoffs in the Hypothetical Repair World. This conformed to Hess's prior experience with potline freeze claims.

_____

[9] On appeal, only subparts (a), (b), and (c) are at issue. The Insurers initially argued that "ordinary payroll" (subpart (c)) and "Ordinary Payroll" (subpart (e)) refer to the same type of payroll expense, attributing no significance to the capitalization (*see* App. to Opening Br. at A391), but, on appeal, argue that the Policy requires these costs to be incurred in order to be included in the calculation. Noranda argued that the capitalization was significant—a point the Superior Court agreed with in its summary judgment ruling—and did not claim coverage under subpart (e) *Id.* at A309.

10

From that experience, Hess opined that labor "is not variable," meaning payroll does not necessarily decrease proportionally with decreased or interrupted production.[10]

According to Hess, repairing and restoring operations after a potline accident required three categories of labor: (1) reline labor, (2) restart labor, and (3) "babysitting" labor. Hess considered the relining and restarting labor as repair labor that was covered in the property-damage settlement. The third category of labor, defined by Hess as "babysitting" labor, was a separate category of post-repair, operational labor that involved monitoring the newly restarted pots and gradually ramping up production.

Before trial, Hess recalculated the Payroll Component associated with the Potline Freeze initially included in his expert report to reflect a more conservative approach. In his recalculation, Hess calculated varying labor expenses throughout the PERIOD OF LIABILITY to reflect an initial decrease in Noranda's labor force while the pots were relined and restarted, and then a gradual increase as post-repair production ramped up and additional labor was needed to "babysit" the pots. These assumptions regarding Noranda's increased projected labor expense had it undertaken the diligent repair of the Smelter with a gradual resumption of operations are central to the Insurers' objection to Hess's damages calculation.

---

[10] App. to Opening Br. at A1570.

Second, based on his experience working on potline freeze claims, Hess understood that the amount of electricity needed for a partially functioning potline would be higher than the amount needed for a fully functioning potline. Hess referred to this disproportionate electrical expense as an "electrical inefficiency" incurred after pots have been repaired, but before the pots are capable of full production capacity, and set the increased expense at $7,461,117.[11] Accordingly, Hess added that figure to Noranda's loss. With this addition, Hess calculated Noranda's Gross Earnings loss to be approximately $43 million. The record is unclear as to how Karutz calculated the Charges and Expenses Component, but his testimony suggests that, in his view, only incurred expenses could be included in the Gross Earnings loss calculation.

According to Karutz, the Payroll Component involved comparing the But For World with the real world rather than the Hypothetical Repair World. Karutz's expert report indicated that a proper calculation of the Measurement of Loss required Noranda's saved payroll to be subtracted from the lost value of production, and as mentioned, that the policy only allowed for incurred expenses to be used in the calculation. Karutz calculated minimal saved labor until the shutdown of the Smelter in March 2016, after which time Karutz calculated Noranda's labor expenses to be zero. Karutz calculated Noranda's real world labor expenses as zero

---

[11] App. to Opening Br. at A1659.

by including the saved labor expenses for potline three, not because the Potline Freeze impacted that potline, but because in the real world Noranda shut down all the potlines. By assuming Noranda's Gross Earnings loss would have been minimal due to its financial distress in addition to assuming no reimbursement for labor expenses after the shutdown of the Smelter, Karutz's Measurement of Loss calculations resulted in drastically lower recovery for Noranda in relation to the Casthouse Explosion and no recovery for Noranda in relation to the Potline Freeze.[12] Given the parties' widely divergent views on how to calculate Noranda's Measurement of Loss, it is not surprising that the Insurers denied Noranda's claim and that this lawsuit followed that denial.

### D. Trial Court Proceedings

In the proceedings below, the issues presented to us on appeal traveled a meandering path, which we will briefly retrace here.[13]

On a motion for partial summary judgment, the Insurers argued, among other things, that Karutz's method of subtracting all three potlines' payroll in calculating

---

[12] Noranda calculated its Measurement of Loss for the Casthouse Explosion to be $23,136,292 and for the Potline Freeze to be $28,206,907. App. to Opening Br. at A2298. Karutz calculated Noranda's Measurement of Loss for the Casthouse Explosion to be $5,489,873 and for the Potline Freeze to be $0. *Id.* at A733-35.

[13] We note that the principal basis for the Insurers' denial of coverage and their principal defense in the Superior Court was that Noranda's claims were barred under the Policy's "idle periods" exclusion. *See Noranda Aluminum Holding Co. v. XL Ins. Am. Inc.*, 2019 WL 1399956, at *6 (Del. Super. March 21, 2019). The Superior Court denied the Insurers' summary-judgment motion and its post-trial motion for judgment as a matter of law on the basis of that exclusion. The Insurers did not appeal those decisions.

Noranda's real world payroll was the correct method for calculating the Gross Earnings loss according to the Policy. Although the Superior Court did not explicitly declare whether the But For World should be compared to the real world or the Hypothetical Repair World, it denied the Insurers' motion because Karutz subtracted the payroll for all three potlines instead of just the two that were damaged in the Potline Freeze:

> [T]he Court believes the parties are in basic agreement. The dispute here is about who or what is included in each category. The issue is complicated by the fact that, at some point after the destruction of potlines one and two, the company decided to or was forced to close the entire facility. As such, the Insurers now want to subtract the payroll for employees who worked on potline three and were let go when the facility closed, even though they agree the loss of gross earnings only relates to potlines one and two. The Court agrees with Noranda that this is not only inconsistent with the policy but also fundamentally unfair. *The simple answer here is that only the earnings that would have been attributable to potlines one and two and the payroll that was saved in the operation of these two potlines should be used in the gross earnings calculation.*
>
> Additionally, because the policy does not cover any time element losses attributable to bankruptcy, it follows that *any "ordinary payroll" saved by Noranda as a result of its bankruptcy proceedings should not factor into the gross earnings calculation. Only "ordinary payroll" saved on the two potlines affected by the physical property damage that the policy covers should be deducted from "Gross Earnings," as used in subparagraph "a."* Any "ordinary payroll" saved on the third potline that was idled due to

14

Noranda's bankruptcy is irrelevant to the calculation of recoverable gross earnings.[14]

Responding to the court's summary judgment ruling, Karutz revised his expert report so that it only subtracted the payroll for potlines one and two.

Both parties then submitted motions *in limine* seeking to exclude the other's expert from testifying, each arguing that the opposing expert's calculations did not follow the court's order. Noranda argued that Karutz's comparison of But For World labor expense to real world labor expense ran contrary to the order because the real world included saved labor expenses attributable to bankruptcy, which the court held should not factor into the calculation. And, for their part, the Insurers argued that Hess's calculations were inconsistent with the order because, instead of deducting labor expenses saved in the operation of potlines one and two, Hess added labor expenses. The Insurers also argued that Noranda's claim for the electrical inefficiency expense should be precluded as it was not covered by any section of the business-interruption coverage. The Insurers noted that Noranda had represented it was not relying on the "Extra Expense" section of the Policy, and argued that "there [was] simply no basis in the Policy for adding this phantom expense."[15]

---

[14] *Noranda Aluminum Holding Co. v. XL Ins. Am., Inc.*, 2019 WL 1399956, at *6 (Del. Super. March 21, 2019) (emphasis added).

[15] App. to Opening Br. at A479.

15

At the pre-trial conference, the court reserved its decision on the motions *in limine* until after *voir dire* of the experts during trial. After *voir dire* of Hess, the Insurers renewed their request that the court preclude Hess from testifying. The court allowed Hess to testify, but reserved decision on whether his testimony should be struck.

After Noranda rested, the Insurers moved for judgment as a matter of law, again questioning Hess's testimony, arguing that the payroll that Hess included under the Payroll Component of the GROSS EARNINGS formula had already been reimbursed under the property-damage settlement. They argued further that even if the payroll had not been included in the settlement, all expenses, including payroll and electrical expenses, must have been incurred to be covered under the Policy. The court again reserved decision on the motion.

After *voir dire* of Karutz, the court ruled that Karutz could not testify to the opinion expressed in his report that Noranda could only account for labor expenses if incurred because it reflected a flawed interpretation of the Policy and "not an expert opinion concerning what is the hypothetical world of bringing [the plant] back together."[16] The court, however, allowed Karutz to offer opinions set forth in a supplemental report he had authored rebutting Hess's Hypothetical Repair World inputs. After the court excused the jury on the last day of trial, the Insurers again

---

[16] *Id.* at A2059.

moved for judgment as a matter of law, incorporating all of their previous arguments. The court denied all the motions, except that it reserved decision on the Insurers' motion regarding the electrical expense.

The jury returned a verdict in Noranda's favor, awarding over $35 million in damages. The notations on the verdict form suggest that the jury used Hess's damages model as the basis for its calculations. After the verdict, the Insurers again moved for judgment as a matter of law on several grounds, including that the electrical costs associated with the Hypothetical Repair World calculation should not have been presented to the jury as potential damages. The court granted judgment as a matter of law in the Insurers' favor on this point—denying the motion on all other grounds—and reduced the jury's verdict by approximately $7 million. After this reduction, the court entered judgment in Noranda's favor in the amount of $28,029,016.50 for Noranda's business-interruption loss from the Casthouse Explosion and the Potline Freeze, and awarded $131,244.09 in professional fees paid to Hess for his work on the Potline Freeze business-interruption claim. The Insurers appealed the Superior Court's entry of judgment in favor of Noranda, and Noranda cross-appealed the exclusion of the electrical expense.

### E. Issues on Appeal

On appeal, the Insurers make three arguments, all challenging the admissibility of Hess's testimony. First, the Insurers contend that Hess's damages

calculation was inconsistent with the Policy's GROSS EARNINGS formula because it included labor expenses associated with the hypothetical restart of the Smelter. Second, the Insurers argue that Hess's damages calculation was based on such facially unreliable factual assumptions as to render it inadmissible as a matter of law. Finally, the Insurers argue that Hess's calculation included damages that Noranda had waived as part of the property-damage settlement.

Noranda cross-appeals the court's judgment as a matter of law regarding the electrical expense associated with restarting repaired pots, arguing that, because that expense was associated with restarting the pots and not repairing the pots, it is an ordinary expense covered by the GROSS EARNINGS formula.

## II. STANDARD OF REVIEW

We review the Superior Court's interpretation of the Policy *de novo*.[17] We review a trial court's decision to admit or exclude expert evidence for an abuse of discretion.[18] In addressing Noranda's cross appeal, we review the Superior Court's decision to grant judgment as a matter of law *de novo*.[19] Ordinarily, to grant judgment as a matter of law, the Superior Court must find that "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue."[20]

---

[17] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 69 (Del. 2011).
[18] *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1268 (Del. 2013).
[19] *Kardos v. Harrison*, 980 A.2d 1014, 1016 (Del. 2009) (citing *Brown v. Liberty Mut. Ins. Co.*, 774 A.2d 232, 245 (Del. 2001)).
[20] *Id.* at 1017 (quoting Del. Super. Ct. Civ. R. 50(a)).

But here, the Superior Court's judgment as a matter of law included legal determinations regarding the scope of coverage under the Policy; we review those determinations of legal issues raised by the parties before the case was submitted to the jury *de novo*.[21]

## III.   ANALYSIS

### A.   Hess's damages model was consistent with the Policy's GROSS EARNINGS formula.

The Insurers argue that Hess's damages model was "dramatically different"[22] than the Policy's Measurement of Loss provision and "allow[ed] the jury to reimburse Noranda for additional labor associated with a plant rebuild."[23]  Shorn of its hyperbolic criticism of Hess,[24] however, we understand the Insurers' principal methodological complaint to be that, although Noranda's hypothetical earnings during the liability period—including those associated with a gradual restart of the potlines—should be taken into account, thereby reducing its gross-earnings loss, the labor expenses that would necessarily be incurred to generate those earnings should

---

[21] *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 744 (Del. 1997) ("The interpretation of insurance contracts involves legal questions and thus the standard of review is de novo.").

[22] Opening Br. at 12.

[23] *Id.* at 23.

[24] In the Insurers' motion *in limine*, they exclaim, for instance, that Hess's calculations "clash violently with [the trial court's summary judgment] Order, the insurance policy, and common sense."  App. to Opening Br. at A449.  In a similar manner, the Insurers characterize Hess's testimony as "wildly unreliable" (Opening Br. at 1), claim that his methodology was "dramatically different" than the Policy's "Measurement of Loss provision" (Opening Br. at 12), and describe his inputs as "facially absurd" (Opening Br. at 38; 39), all leading to a "massive overstatement of Noranda's claim." (Opening Br. at 14).

19

not. We find no warrant in the Policy for such a one-sided calculation and therefore reject this argument.

At the outset, we note that our understanding of Hess's treatment of Noranda's projected labor expense during the hypothetical rebuild differs from the Insurers'. In particular, we take issue with the Insurers' persistent claim that Hess's methodology inappropriately permitted "the labor costs required to *rebuild* [Noranda's] plant."[25] Contrary to the Insurers' characterization, we do not see the costs underlying Hess's labor-expense assumptions as reconstruction costs; rather, they reflect the labor costs, including increased labor expense associated with the operation of newly restarted pots—the so-called "babysitting expenses," incurred as Noranda would, albeit hypothetically, ramp up production. This important distinction informs our response to the Insurers' legal argument. We now turn, then, to the Insurers' claim that Hess's consideration of Noranda's hypothetical labor

---

[25] Opening Br. at 13 (emphasis added). *See also id.* at 23 ("It was error for the court to allow the jury to reimburse Noranda for additional labor associated with a plant rebuild."); *id.* at 26 ("…Noranda's 'dual hypothetical worlds' damages model requires a calculation of the costs of rebuilding the facility, is directly contrary to the plain language of the policy."); *id.* at 27 ("[T]he Policy's unambiguous language bars a claim for 'hypothetical rebuilding costs."); *id.* at 28 ("[T]he hypothetical costs of rebuilding the facility have no place in the Policy's Measurement of Loss Calculation."); *id.* at 29 (claiming that Hess's model "add[ed] into the claim the costs of a labor-intensive reconstruction of the facility."); *id.* at 31 ("The amount of recoverable losses is limited to the estimated lost revenues minus variable costs—and does not include the cost of rebuilding the plant.").

expenses during the ramping-up period of a hypothetical rebuild was inconsistent with the Policy.

According to the Insurers, the Policy unambiguously "provides a clear 'revenues minus variable costs' damages formula," and therefore Hess's "Dual Hypothetical Worlds"[26] damages model contravenes the Policy's GROSS EARNINGS formula.[27] We agree with the Insurers, as does Noranda, that the Policy provides a "revenues minus variable costs" damages formula. But we do not agree with the Insurers that Hess's model is untrue to that formula. That Hess's calculations result from inputting hypothetical revenues and hypothetical expenses does not make Hess's model any less of a "revenues minus variable costs" model. As the Third Circuit Court of Appeals has observed, "[i]nherent in the concept of business interruption insurance is the necessity of insureds making claims for lost earnings based in large part on estimates of things that have not happened . . . ."[28]

The Insurers recognize that "[t]he Policy's language required that the parties estimate Noranda's revenues and variable costs if the accident had not occurred."[29] This world in which the accident had not occurred is itself a hypothetical world.

---

[26] We take the Insurers' reference to Hess's "Dual Hypothetical Worlds" damages model to mean his comparison of the But For World with the Hypothetical Repair World—both of which are hypothetical scenarios—in order to calculate Measurement of Loss.
[27] Opening Br. at 23-25.
[28] *Am. Med. Imaging Corp. v. St. Paul Fire & Marine Ins. Co.*, 949 F.2d 690, 694 (3d Cir. 1991).
[29] Opening Br. at 25.

Furthermore, the Insurers agree that the correct comparison for calculating the Gross Earnings Component is between the world in which no accident occurred—a hypothetical world—and the world in which Noranda made repairs after the accident occurred—again, a hypothetical world.[30]  Yet despite their own dual-hypothetical-world comparison for the Gross Earning Component, the Insurers argue for a hypothetical-to-real-world comparison for the remaining components of the GROSS EARNINGS formula.  This would allow the Insurers the benefit of a smaller Measurement of Loss payable to Noranda calculated by taking net revenues into account without considering any of the associated expenses needed to realize those revenues.  In our view, this would not accurately capture Noranda's loss.  Accordingly, we do not find Hess's comparison of dual hypothetical worlds contrary to the Policy, especially in light of the Insurers' own reliance on a comparison to a hypothetical world.[31]

The Insurers contend that Hess's methodology is "unprecedented" and unsupported by any legal authority.  And, admittedly, Noranda has not pointed us to a reported decision that adopts Hess's damages model.  But neither do the Insurers refer us to any cases that establish a method for calculating an insured's gross-

---

[30] App. to Opening Br. at A1971.

[31] *See Shuck v. CNH Am., LLC*, 498 F.3d 868, 874 (8th Cir. 2007) ("When a litigant clearly believes a certain methodology is acceptable as shown by his or her own expert's reliance on that methodology, it is disingenuous to challenge an opponent's use of that methodology.").

earnings loss when the insured, for whatever reason, chooses not to rebuild.[32]  When an insured repairs after an accident, the comparison is obvious—the world in which no accident occurred and the real world.  Indeed, two of the cases from other jurisdictions cited by the Insurers—*Associated Photographers, Inc. v. Aetna Casualty & Surety Co.*[33] and *National Union Fire Insurance. Co. v. Anderson-Prichard Oil Corp.*[34]—present that very scenario and are, for that reason, uninstructive.  And the only other opinion cited by the Insurers on the point, *East Associated Coal Corp. v. Aetna Casualty & Surety Co.*,[35] involves the interpretation of a business-interruption provision to determine, in part, whether expenses associated with an arbitration judgment against the insured were covered.  Because of the notably different issue presented, this case also does not support the Insurers' attack on Hess's dual hypothetical methodology or convince us that Hess's methodology is contrary to the Policy.

The Insurers also seek to distinguish this case from *DiLeo v. United States Fidelity & Guaranty Co.*,[36] an Illinois case in which the court found the insured's labor costs were covered by its business-interruption insurance even though the labor

---

[32] The Insurers do not argue that Noranda is not entitled to recover because it did not rebuild, but rather, that under its business-interruption coverage Noranda's recoverable loss is negligible, if recoverable at all.

[33] 677 F.2d 1251 (8th Cir. 1982).

[34] 141 F.2d 443 (10th Cir. 1944).

[35] 632 F.2d 1068 (3d Cir. 1980).

[36] *DiLeo v. U.S. Fid. & Guaranty Co.*, 248 N.E.2d 669 (Ill. App. Ct. 1969).

costs were not actually incurred. Dismissing *DiLeo* as "inapposite," the Insurers argue that "Noranda's Policy [is] devoid of the language that formed the basis for the *DiLeo* opinion."[37] The Insurers are correct that the policy at issue in *DiLeo* is different than the Policy we are interpreting here. But that difference was not critical to the Illinois court's recognition of two principles that are relevant here: (1) "Under policies which insure against loss from the interruption of business, the fact that the period required to rebuild or replace with due diligence and dispatch is entirely theoretical does not impede recovery;"[38] and (2) "The fact that . . . payroll expenses are entirely theoretical should not impede recovery of them."[39] At a minimum, *DiLeo* lends support for the proposition that, when an insured does not go back into business, the consideration of hypothetical scenarios is appropriate.

The Policy provides no explicit guidance on the proper comparison when, as in this case, the insured does not repair. In the absence of such guidance, it is fitting to anchor our analysis to the parties' mutual understanding that the GROSS EARNINGS formula is designed to measure the loss with reference to the insured's loss of revenue, taking into account its savings achieved through the elimination of variable costs. As mentioned, this framework, by its very nature, involves the

---

[37] Opening Br. at 33.

[38] *DiLeo*, 248 N.E.2d at 676.

[39] *Id.*; *see also Nat'l Union Fire Ins. Co. v. Scandia of Hialeah, Inc.,* 414 So. 2d 533, 535 (Fla. App. 1982) (citing *DiLeo*, 248 N.E.2d 669) (upholding jury verdict notwithstanding conflicting evidence of estimated gross-earnings loss charges and expenses that would not have been continued during the period of business interruption).

24

consideration of suppositions—or, in the Insurers' words, "hypothetical" facts. For instance, the computation of the insured's loss must suppose that, had the accidents not occurred, the insured would have generated a certain measure of earnings during the period during which the insured's operations are repaired or rebuilt.

The formula also contemplates that the calculation will account for any saved costs—if there be any—because of the temporary cessation of the insured's operations. The determination of the amount of such savings requires a predictive judgment. Of course, these predictive judgments must be grounded in a realistic assessment of the known facts. The weight or accuracy of these predictive judgments is then left for the jury to assess.[40]

Here, the parties' experts made glaringly disparate assumptions about the extent to which Noranda's operational labor costs would be "saved" during the liability period had Noranda rebuilt. Karutz's trial testimony on behalf of the Insurers assumed 100% labor savings for the two downed potlines and held to that assumption even during the hypothetical ramping-up period. The Insurers contend that this assumption was appropriate because "the Gross Earnings formula requires subtracting out ordinary, variable costs required to generate the Gross Earnings," and "presumably such variable costs are saved during the period of business

---

[40] *Pryor v. State*, 453 A.2d 98, 100 (Del. 1982) ("The jury is the sole judge of a witness' credibility and is responsible for resolving conflicts in testimony.").

interruption."[41] But there is evidence in the trial record, contrary to the Insurers' presumption, from which the jury could conclude—as they did—that, had Noranda rebuilt, there would not be a 100% labor reduction for the downed potlines. There would be, as Hess described, saved labor in the months immediately following the accident, followed by an increase in labor expense as production was ramped up. This did not result in, as the Insurers claim, an "*add*[ition] into the claimed recovery [of] the labor costs required for a hypothetical rebuild of the facility."[42] As Hess explained, the insured labor costs during the ramping-up period did not extinguish the entirety of the saved labor expense; it merely reduced the amount of the savings from approximately $6.1 million to approximately $1.6 million. And when pressed on cross-examination, Hess denied that the increased labor expense increased Noranda's claim, explaining that the added labor "contribut[ed] to the production coming back, . . . decreasing the claim."[43]

A careful review of the Insurers' arguments below reveals that their core complaint with Hess's calculation is not so much with his methodology but with his inputs, particularly his handling of saved labor expenses. This conclusion is supported throughout the record, but here we identify two instances that make the

---

[41] Opening Br. at 25 (emphasis omitted).
[42] *Id.* (emphasis in original).
[43] App. to Opening Br. at A1670.

26

point. In Karutz's expert report, he noted that "[p]ayroll savings is the central issue driving the major difference between [Noranda's] claim and my measure."[44] And more to the point, when the Insurers argued their motion *in limine* below, they emphasized that there were four separate reasons why Hess's testimony should be precluded. None of those reasons directly challenged Hess's dual hypothetical methodology.[45] We therefore turn to the Insurers' challenge to Hess's factual assumptions.

**B.** **The Superior Court did not abuse its discretion in permitting Hess to offer an expert opinion that made certain factual assumptions regarding Noranda's labor expense during a hypothetical rebuilding and restarting of the Smelter.**

The Insurers also challenge Hess's testimony on the grounds that his opinions were based on unreliable factual assumptions. Because Hess's testimony was based on information received from a former plant manager, Chad Pinson, and Hess "did not perform any independent analysis of whether that number [given to him by Pinson] of people was actually required to repair and restart the plant,"[46] the Insurers contend that his opinions were unreliable as a matter of law. Although the Insurers frame this claim as a legal question, they acknowledge that we are to review the

---

[44] *Id.* at A742.

[45] The four reasons were: Hess's fact-based conclusions regarding saved labor expenses; the property-damage-settlement-release and the applicability of the policy's "extra expense" provision; Noranda's pre-accident financial woes; and Hess's reliance on the December 15, 2015 timeframe to determine Noranda's hypothetical labor expense during the PERIOD OF LIABILITY. *Id.* at A1633-36.

[46] Opening Br. at 35.

Superior Court's decision not to exclude Hess's testimony on this basis for an abuse of discretion.

Under Delaware Rule of Evidence 702, expert testimony must be based on sufficient facts or data to be admissible. Applying this rule, we have recognized that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility and it is for the opposing party to challenge the factual basis of the expert opinion on cross-examination."[47]

To calculate the Payroll Component, Hess estimated the labor force needed in the Hypothetical Repair World. He testified that he based his labor estimate on a conversation with Pinson, who had worked for Noranda for twenty years in various roles, including as the Smelter's plant manager. Pinson provided support for two key assumptions made by Hess. First, Pinson testified that, during a 2009 potline freeze, Noranda had "kept all employees onboard because it actually takes more labor to restart a potline and restart all these pots."[48] This was consistent with Hess's experience working on other aluminum smelter claims in which the insured's labor expense did not decrease proportionally with decreased production. Second, during his tenure as the plant manager, Pinson oversaw the Smelter's repair process after a potline freeze in 2009. Pinson provided Hess an estimate of the number of

---

[47] *Perry v. Berkley*, 996 A.2d 1262, 1271 (Del. 2010) (citing *Porter v. Turner*, 954 A.2d 308, 313 (Del. 2008)).
[48] App. to Opening Br. at A1263.

employees that would be needed to bring the potlines back into full operational capacity.

Pinson's estimate, which was consistent with Hess's experience in other smelter restarts, formed the basis for Hess's allocation of Noranda's projected labor expense among three different types of labor: (1) "reline labor" devoted to the reconstruction of the pots; (2) "physical restart labor;" and (3) "operational labor" needed during the reconstruction period "to get production out of the pots and to maintain . . . the pots from getting out of control."[49] Hess also relied on his own observations from other smelter restarts, which corroborated Pinson's statements.

In keeping with the general tenor of their argument, the Insurers characterize Hess's assumptions generally as "extraordinary and facially implausible,"[50] and, in particular, the assumption that Noranda's plant would remain at full employment despite the elimination of two of the three potlines "facially absurd."[51] As such, say the Insurers, they did not provide a sufficiently reliable foundation for Hess's calculations, and for that reason, the Superior Court should have excluded Hess's testimony.

The Superior Court disagreed with the Insurers' characterization, explaining in its post-trial ruling:

---

[49] *Id.* at A1567-68.
[50] Opening Br. at 34.
[51] *Id*. at 38.

29

> The Court has again read the testimony of both experts, including the extensive voir dire that was allowed, and believes its previous ruling continues to be correct. This is simply two experts making calculations with the underlying assumptions fully presented to the jury.[52]

In our view, this evidentiary ruling was well within the trial court's discretion. Admittedly, it might seem counter-intuitive that Noranda would keep their employees on the payroll during a lengthy plant shut down. But the evidence in the form of a historical precedent and Hess's experience supported that assumption. And that same history and experience provided a basis, rooted in the evidence, for the increased labor expense during the hypothetical ramping-up period. Having failed to persuade the trial court that these assumptions were mere "guesswork,"[53] the Insurers were free to cross-examine Hess vigorously (they did) and make their argument to the jury (they did that as well). That the jury found Hess's assumptions more credible than the Insurers' critique of them does not provide a basis for reversal.

**C.    The Superior Court did not abuse its discretion in admitting Hess's testimony that his damages calculation did not include damages that were covered in the property-damage settlement.**

The Insurers argue the Superior Court erred in admitting Hess's testimony because Hess's calculation included damages that were included in the property-

---

[52] *Noranda Aluminum Holding Co. v. XL Ins. Am., Inc.*, 2019 WL 5268696, at \*2 (Del. Super. October 7, 2019).

[53] Opening Br. at 37.

30

damage settlement. The Insurers' challenge is twofold. First, the Insurers argue that the "babysitting" labor is repair labor and thus already paid to Noranda under the property-damage settlement. Second, the Insurers contend that the manner in which Hess's calculation distinguished repair labor costs from operational "babysitting" labor costs was unreliable.

In calculating the Payroll Component of the GROSS EARNINGS formula, Hess estimated the labor force Noranda would need in the Hypothetical Repair World. As noted above, based on information provided by Pinson and his personal knowledge of potline damage claims gained during "over 20 engagements related to the aluminum industry, 15 of which . . . related to a potline freeze or smelter loss,"[54] Hess accounted for three categories of labor: reline labor, restart labor, and babysitting labor. Hess considered the babysitting labor—as mentioned, the labor devoted to maintaining and deriving production from the pots once they are restarted—to be "operational" labor. The Insurers' claims adjuster, who was involved in the property-damage claim, acknowledged that this labor was not included in the property-damage settlement.

Hess valued the repair labor expenses, including both reline labor and restart labor, at $6.6 million. This estimate was based on, among other things, facts learned during his preparation of the schedules in support of Noranda's property-damage

---

[54] *Id.* at A1648.

claim. Hess therefore reduced the Payroll Component for the Hypothetical Repair World calculation by that amount. This left only the post-repair operational labor—the "babysitting" labor—during the PERIOD OF LIABILITY included in his damages calculation for Noranda's business-interruption claim.

The Insurers pointed critically to Hess's *voir dire* testimony, which suggested that he did not know how many people would be restarters, whose labor would be covered, and how many would be repairers, whose labor would not be covered. But the Insurers' own expert admitted that Hess's calculation of the "babysitting" costs was "pretty close."[55]

The Superior Court found that the factual basis for Hess's labor calculations was a fact issue to be presented to and considered by the jury. As the Superior Court suggested, if the Insurers doubted Hess's testimony that $6.6 million in labor costs could be attributed to repair labor that was included in the property-damage settlement, they had ample opportunity to test that testimony on cross-examination or to offer evidence to the contrary. We agree with the Superior Court. The Insurers' complaint was not with the method used to distinguish the repair labor from the operational labor, but rather with the dollar figure assigned to the repair labor. Any flaw in that conclusion was a fact question to be resolved by the jury.[56]

---

[55] *Id.* at A2127.
[56] *Ashley v. State*, 988 A.2d 420, 424 (Del. 2010).

32

The jury was informed of the property-damage settlement and the waiver during the trial and was reminded during the court's instructions that Noranda had already collected under the property-damage coverage. And the court instructed the jury that Noranda was not entitled to recover any damages or expenses that the jury found were covered in the property-damage settlement. Allowing the issue to be resolved by the jury under these circumstances was not an abuse of discretion.

D.   **Noranda's increased hypothetical expense caused by electrical inefficiencies was properly excluded from Noranda's Measurement of Loss calculation.**

In its cross appeal, Noranda argues that the Superior Court erred when it granted the Insurers' motion for judgment as a matter of law and reduced the jury's verdict by the $7 million Hess attributed to the electrical inefficiency expense in the Hypothetical Repair World.[57] The Superior Court reasoned that the increased electrical expense associated with the hypothetical restart of the pots was a "non-routine extra expense[ ] unrelated to the normal operation of [Noranda's] business"[58] and, therefore, not encompassed within the Policy's GROSS EARNINGS formula.

Noranda argues that "electricity is a significant cost in aluminum production"[59] and, thus, both the But For World and the Hypothetical Repair World

---

[57] Hess's total electrical charge totaled $7,461,117. The jury did not issue a special verdict, but the Superior Court pointed out "the parties seemed to agree that in their calculation of damages, the jury included the $7 million figure in the damage amount." *Noranda*, 2019 WL 5268696, at *3.

[58] *Id.*

[59] Answering Br. at 61.

calculations must account for electrical expenses. The increased cost associated with the electrical inefficiency should be included in the Measurement of Loss calculation as a normal charge and expense. To do otherwise, according to Noranda, would be fundamentally unfair because it would decrease the measurement of its loss by the amount of increased production during the ramping-up period, without allowing for the costs it would incur to achieve that production.

Noranda's argument has a certain surface appeal and even a kinship with its argument regarding its fluctuating labor expense in the Hypothetical Repair World. After all, earlier in this opinion, we accepted the premise that the labor expense associated with the generation of loss-mitigating revenues must be considered when calculating Noranda's Gross Earnings loss.

Nevertheless, we see a critical distinction between Noranda's labor expense and the electrical inefficiency expense, at least as the two were presented at trial. In particular, Hess's consideration of an increase in labor expense during the ramping-up period was merely a component of his calculation of the saved labor expense during the entire PERIOD OF LIABILITY; as such, it was in service of the task of determining the extent to which variable costs were saved during the liability period.

Moreover, Noranda tied Hess's saved labor calculation to the Payroll Component of the Policy's GROSS EARNINGS formula.

By contrast, Noranda grounds the addition of the electrical inefficiency claim to the Charges and Expenses Component of the GROSS EARNINGS formula. That subsection calls for the reduction of the insured's gross-earnings loss for "charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations . . . ."[60] We have reviewed Hess's calculations and trial testimony and can find no effort on his part to calculate the extent to which Noranda's electrical expense did not continue or was reduced during the liability period. Instead, he considered the electrical inefficiency as a freestanding "claim" and added it to Noranda's gross-earnings loss.

It is telling that Hess repeatedly referred to the increased expense caused by electrical inefficiency as a "claim," one that he helped Noranda make following the 2009 potline freeze.[61] But in 2009, Noranda restarted the pots and actually incurred the increased electrical expense, which would trigger coverage under the Extra Expense provision of the Policy. Noranda acknowledges that Extra Expense coverage is not available here because, under that provision, to be covered, the extra expense must actually be incurred. This explains, we suspect, why Noranda has

---

[60] App. to Opening Br. at A205.
[61] *Id.* at A1659.

35

attempted to shoehorn this "claim" into the Measurement of Loss calculation.  We agree, however, with the Superior Court, albeit for different reasons, that there is no warrant in the GROSS EARNINGS formula for the addition of this "claim."

## IV.    CONCLUSION

For these reasons, we affirm the judgment of the Superior Court.